IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

**FILED**

**May 16, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 12-0075

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JAMES R.L. MEADOWS
Defendant Below, Petitioner

Appeal from the Circuit Court of Monroe County
Honorable Robert A. Irons, Judge
Criminal Case No. 10-F-53

AFFIRMED

Submitted: April 17, 2013
Filed: May 16, 2013

James M. Cagle, Esq.
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey
Attorney General
Scott E. Johnson, Esq.
Senior Assistant Attorney General
Charleston, West Virginia
Counsel for the Respondent

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS BY THE COURT

1. "In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syl. Pt. 2, *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

2. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

3. "Polygraph test results are not admissible in evidence in a criminal trial in this State." Syl. Pt. 2, *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979).

4. "Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule

403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." Syl. Pt. 10, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

5. "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

6. "In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Syl. Pt. 6, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

Per Curiam:

James R.L. Meadows, defendant below, appeals from the December 20, 2011, sentencing order of the Circuit Court of Monroe County. He challenges his conviction for one count of murder in the second degree, one count of death of a child by a guardian or custodian, and one count of child abuse resulting in injury. Meadows contends that the trial court committed error by (1) granting a change in venue without a showing of good cause; (2) allowing testimony by a State's witness concerning polygraph test results without ordering a mistrial or providing a curative instruction; (3) allowing the introduction of hearsay evidence in the form of the testimony of a child psychologist about play therapy without adequate foundation; (4) deeming evidence of a child psychologist regarding the character of the accused to be admissible; and (5) permitting the introduction of gruesome photographs. Meadows complains that he was deprived of the right to a fair trial not only on these grounds but also because he had ineffective assistance of counsel at trial. He seeks reversal of his conviction and remand for retrial.

After completing a careful and thorough study of the arguments of the parties as presented in the written briefs and at oral argument, we affirm.

## I. Factual and Procedural Background

This case involves the death in November 2010 of a seventeen-month-old girl due to profound abuse. It is uncontested that the toddler, I.H.,[1] died as the result of repeated blows to her head and body on November 4, 2010. The issue at trial centered on whether Meadows or the victim's mother, Christen H., inflicted the injuries that caused the child's tragic death.

Meadows was living with the toddler's mother. Christen had purchased a trailer that she moved into with Meadows, her three-year-old son,[2] and the victim about a week before the beating occurred. On the day at issue, it appears that the brother[3] was not at the trailer but was staying with maternal grandparents.

Melissa Gill lived in a trailer across from Christen's trailer. Ms. Gill testified she went to Christen's the evening before the toddler was fatally injured in order to recharge her cell phone because the electricity in her trailer was out. The neighbor said that Christen,

---

[1]Pursuant to Rule 40 of the *West Virginia Rules of Appellate Procedure*, the identities of juveniles are protected in Court documents. Initials or descriptive terms are used instead of full names to promote confidentiality.

[2]The toddler and her brother are the children of Christen and Dustin H. who were not divorced.

[3]Since the children share the same initials we will simply refer to the boy as "brother" and the girl as "toddler" or "victim."

Meadows and the toddler were at the trailer when she dropped by on November 3, 2010, and the toddler quietly sat in her lap during most of the visit until Ms. Gill left around 10 or 10:30 p.m. She said that while holding the child she observed a few minor bruises on her forehead and lip.

The record reflects that Christen got up early on November 4, 2010, because she had a scheduled appointment at 8:00 a.m. with the county Department of Health and Human Resources ("DHHR"). She said she left around 7:00 a.m. to go to her mother's to bathe since she did not have running water in her trailer. According to Christen, she called her mother on her cell phone before leaving to tell her she would be arriving shortly. During the call Meadows was awake and sitting on the couch, and the toddler was sitting on the couch with her "sippy cup." Christen's mother confirmed that this call had been made, adding that she heard the toddler talking and playing in the background of the conversation. Christen said that when she left the toddler with Meadows in the trailer that morning she gave her cell phone to Meadows "[j]ust in case anything would happen."

From her mother's home, Christen took her son to the DHHR appointment. She said that she had been at DHHR approximately twenty minutes before she received the call from Meadows informing her that her daughter had been rushed to the hospital. Christen

3

went to the hospital. She said that Meadows told her when he later arrived at the hospital that the child had fallen.

Ms. Gill testified she was awakened around 8:30 or 8:45 the morning of November 4, 2010, by Meadows who was carrying the victim in his arms. Ms. Gill observed that the toddler was "unconscious and not responsive" and her breathing was "raspy." Finding that Meadows had not called anyone for assistance, she immediately placed a call to 911. Ms. Gill further related that she saw and heard Meadows using a cell phone to call his mother during this time.

According to one of the paramedics who arrived with the ambulance around 8:55 a.m., he found the toddler "totally unresponsive," meaning there was "[n]o crying, no movement, no spontaneous response. . . . She was just totally limp." He further noted "bruising patterns" on the child's body which ranged from "a very old bruise . . . to very new bruises. . . ." The paramedic said the basis for what he placed in his report as to the cause of the toddler's condition was the information Meadows gave him at the scene. He said Meadows told him that he had been in the back of the trailer when he heard a thud. When Meadows investigated the source of the noise, he discovered that the child had fallen onto the floor and was unresponsive.[4]

[4]Meadows gave a statement to West Virginia State Police Sgt. Christopher Smith on November 4, 2010, and the recorded statement was played for the jury during the

4

Ms. Gill followed the ambulance to the local hospital; Meadows remained at Christen's trailer. The toddler was in the emergency room of the local hospital for about three hours when the attending doctor concluded that her extensive injuries could not be managed at the facility. The toddler was transported by ambulance to the more specialized care and treatment available at a Charleston medical facility. During the transport, the child's condition became very unstable and remained that way for the duration of the trip despite paramedic intervention. The toddler died in Charleston on November 6, 2010.

Meadows was indicted on November 16, 2010, for one count of murder in the first degree, one count of a guardian or custodian causing the death of a child, and one count of child abuse resulting in bodily injury.[5] Prior to trial, defense counsel filed motions to prevent any reference by the State of polygraph testing of Meadows, and for a change in

---

trooper's testimony at trial. The substance of that statement was not transcribed or otherwise supplied as part of the record in this appeal.

[5]Other legal actions were also initiated. According to a plea agreement filed in the circuit court on September 2, 2011, which was admitted into evidence at trial, Christen was charged in a two count indictment with permitting the death of a child by a parent, and child abuse resulting in injury. The plea agreement reflects that Christen pled guilty to the lesser included offense of gross neglect of a child in exchange for her cooperation with the State's prosecution of the case. The plea agreement included the stipulation that Christen "grossly neglected her child as defined by West Virginia Code § 61-8D-4(e) by permitting that child to be in the temporary care, custody, and control of R.L. Meadows."

Additionally, there are repeated references during the trial to a child abuse and neglect proceeding. Documentation of anything regarding that proceeding is not part of the record in this appeal.

venue; the State filed a notice of intent to introduce evidence pursuant to Rule 404(b) of the

*West Virginia Rules of Evidence* (hereinafter "Rule 404(b)"). The request regarding

polygraph testing was granted, and the motion to change venue was initially denied. With

regard to the denial, the trial court noted on the record that "if it becomes obvious we can't

get a jury [in Summers County], typically what we do is have a jury over in Monroe County."

No objection was made to the venue ruling.

Immediately before trial began, defense counsel objected to the use or

admission of any photographs by the State, particularly those depicting the child's injuries.

The State argued that the photographs were not being used to inflame the jury but to show

the condition of the child. The trial court found that the probative value of the depiction of

the child's injuries outweighed the prejudicial effect under the circumstances and denied the

motion.

A three day jury trial commenced in Monroe rather than Summers County on

September 14, 2011.[6]  Before beginning voir dire the trial court explained:

> And the reason that the case was transferred to Monroe
> County was that we anticipated there would be some difficulty
> in selecting a jury in Summers County. And it was felt that it
> would be prudent to transfer the case to Monroe County for trial

[6]There is nothing in the record itself which documents when the decision to change venue was made, how the parties were notified of the change or any other circumstances surrounding the transfer.

6

purposes so that we could have a panel of jurors to pick from who probably knew little or nothing about this case. This case had publicity in Summers County. And it was transferred here so that we have a pool of people who really don't – hopefully don't know anything about this case.

The full investigation surrounding the death of the child was handled by the State Police Crimes Against Children Unit. Sgt. Melissa Clemons, a member of the unit, testified that she began her investigation at the hospital in Summers County while the victim was in the emergency room on November 4, 2010. Meadows was not at the hospital when Sgt. Clemons arrived, but Christen, the brother, the maternal grandparents, and Ms. Gill were there.

Sgt. Clemons said that from the local hospital she went to the scene in order to photograph the area in the trailer where Meadows said he found the child unconscious. Meadows and Christen arrived at the trailer, and allowed Sgt. Clemons to measure and photograph various angles of the couch to determine distances the child could have fallen based upon Meadow's story. Pictures were also taken of the bed in the trailer since Sgt. Clemons had been told that some of the bruises on the victim's face were due to her falling off the bed twice sometime earlier in the week.

A CPS worker testified that a November 4, 2010, abuse and neglect complaint was the first one filed against this family. The worker went to the hospital that day as the

7

"responding worker on a crisis call."  She spoke with Christen at the hospital and said Christen had told her that two days before November 4, the victim had been jumping on the bed when she fell off and hit her head.  The toddler then got up and went into the living room and started jumping on the couch until she fell off.  On cross-examination, the CPS worker said that during a second interview with Christen, the mother said Meadows had phoned her on November 4th and said that the toddler had been jumping on the couch and a bed and fell and struck her head twice.  The worker also related that Christen had disclosed that when the toddler had gone toward a road with traffic two days before November 4, Christen had jerked her back by the arm and spanked her.[7]

The Chief Medical Examiner of West Virginia, James A. Kaplan, M.D., testified that the injury to the victim's brain was most likely the cause of her death.  He termed the injury an "abusive closed-head injury" resulting from "a violent acceleration/deceleration force that was applied to the victim's brain, almost certainly in the setting of a repeated impact of her head to a surface. . . . [In these] type of assaults, the child's behavior becomes immediately abnormal.  May not die right away, but it becomes immediately abnormal."  He said that there was "almost certainly a separate impact" that caused each of the eight bruises he pointed out to the jury in autopsy photographs of the

---

[7]The autopsy report relates that the victim had a non-displaced fracture of the left distal radius with evidence of healing.

8

surface of the victim's brain tissue.[8]  He concluded, "[s]o this obviously takes it – this takes this sort of injury out of the realm of an accidental occurrence, unless there was a bizarre story."  He explained that a fall would not account for the number of separate bruises and the tearing of the brain tissues he found.  He also identified numerous internal injuries, including a severe injury to the toddler's colon, pancreas and liver, which he said were sustained as "the result of powerful impacts to her tummy.  Somebody either kicked or punched . . . [this toddler] in the stomach very, very hard."  In response to the question about which of the child's injuries were considered the most serious, the medical examiner said:

> Well, the injury to . . . [her] brain was the injury that probably, more than anything else, caused her death, although there were injuries to her pancreas and her liver and her gut which would have been very, very difficult to manage medically and may have caused her death eventually.

The doctor also noted that some of the bruises on the victim's body were old bruises not related to the cause of death. Reading from his report which was admitted into evidence, Dr. Kaplan recited his opinion that the victim "died as a result of a fatal assault upon her person by a caretaker.  The histologic appearance of injuries noted at autopsy is consistent with the investigational findings indicating fatal assault occurred close to the time of initial hospitalization."

---

[8]Although defense counsel did not renew his objection to the introduction of the photographs taken at the trailer or at either of the hospitals, he did preserve his objection to the introduction of the five autopsy photographs.

At the second day of trial, a hearing was held in camera regarding the Rule 404(b) evidence the State sought to admit. The evidence included the testimony of the licensed psychologist to whom DHHR referred the brother for evaluation and treatment,[9] and the testimony of witnesses who had seen Meadows the previous month grab the toddler by the arms to pick her up, speak harshly to her and then toss her onto a couch. After conducting its analysis, the trial court ruled all of the testimony admissible subject to a limiting instruction that the evidence may be considered only for the purposes of determining whether the victim's injuries were the result of an accident or mistake, and for determining the identity of the individual who inflicted the injuries that caused the death.

During the 404(b) hearing, defense counsel raised several concerns related to the admissibility of the psychologist's testimony in lieu of the brother being placed on the stand. Defense counsel in essence objected to the testimony as being beyond any hearsay exception permitted under Rule 803(4) of the *West Virginia Rules of Evidence* (hereinafter "Rule 803(4)"), as a constitutional violation of the protections guaranteed under the confrontation clause of the Sixth Amendment. The lower court ruled that any statements the brother made were not done for testimonial purposes or preparation for trial and thus were not an affront to the confrontation clause. The court further noted pursuant to *State v. Payne*,

_____

[9]According to the record, the psychologist said DHHR referred the brother to him for evaluation and treatment related to dealing with his sister's death and to his adjusting to the change to the new home environment of living with his father.

10

225 W.Va. 602, 694 S.E.2d 935 (2010),  that "testimony of a treating medical provider as to things that took place in the context of treatment, as opposed to interrogation or trial preparation, is generally admissible."

The psychologist, Steve Ferris, testified the approach he typically took with these type of referrals was to allow the child to play and interact with toys while he observed and asked occasional questions.  The brother gave names to two figures: he named one toy "Ro-Ro" and the other "Sissy."  The therapist knew that Meadows's nickname was R.L., and said that he took "Ro-Ro" to be the then 4-year-old's attempted pronunciation of "R.L."  Mr. Ferris understood the "Sissy" toy as the brother's representation of the victim.  Mr. Ferris said that he had seen the brother for eleven sessions and admitted that some of the stories the brother related during play therapy were fanciful imaginings of a child.  Nevertheless, he said he saw two themes emerge from the play therapy: (1) the brother's grief over the loss of his sister, and (2) his feelings regarding "Ro-Ro," who was described by the brother as someone living with his mother, being around his mother, and being somewhat violent in the home. Ferris testified that the brother talked of Ro-Ro sometimes being mean to him by kicking him in the back and hitting him in the face.  When playing with the Sissy doll the child talked in gentle whispers and interacted in a protective way.  Mr. Ferris related that in one session while the brother was playing with the Sissy doll he "spontaneously said, Ro-Ro knocked her out.  And made a quick hitting motion with his arm and used the word – very loud, he said

11

pow. And then said, Sissy going to sleep." Mr. Ferris said when he talked about the Ro-Ro

figure the brother wanted to place the Sissy figure "about as far away [from each other] in

the room as he could." The therapist said that the brother talked about "Ro-Ro whipping

Sissy's butt." When asked about his opinion to a reasonable degree of psychological

certainty[10] of whether the brother witnessed and maybe experienced violence at the hands of

Meadows in the child's home, Mr. Ferris stated,

> I do believe with the consistency that he's talked about it, that
> he's witnessed some violence, maybe experienced violence. But
> that's been – if there's been a consistent theme in the sessions
> that's been outside the grieving of his sister, that has been the
> second most consistent theme.

During her testimony, Christen said that when she was allowed to see her

daughter at the hospital emergency room she saw new bruises all over the toddler's body.

After questioning Christen during cross-examination about the incongruity of the statements

she made to Sgt. Clemons about the toddler's injuries, defense counsel proceeded to ask:

> Q. Is there any way for us to tell in your statement which
> – what is truthful and what wasn't?
>
> A. Is there any way?
>
> Q. Yes, ma'am. You give a lot of different
> versions of everything.
>
> A. I've already took a polygraph to it, and I passed.

---

[10]Mr. Ferris testified during cross-examination at the in camera hearing that his testimony was based on "psychological certainty."

Thereafter, defense counsel referred to another statement Christen made to Sgt. Clemons in which she changed what she initially told the officer about having grabbed the toddler by the arm and hit her. Defense counsel then asked:

> Q. Did she take a statement from you about that or when was that, you gave – she answered.

> A. Actually, they took a second statement when I took my polygraph. I told them then.

Later, on re-cross examination defense counsel continued to question the truthfulness of Christen's statements as follows:

> Q. [Y]ou say that, now you're being truthful. I mean, how do we know that? Do we just – do you wave some kind of magical wand and, all the sudden, you tell the truth after you've admitted to lying numerous times? You lied to . . . [the CPS worker], according to her testimony. You say that you didn't make these statements that the State Police have attributed to you. You looked at the statement, and you read it. It's got your name beside it, saying that you said it. You say, no, I didn't say – I lied when I said it or, in another instance, you said, no, I didn't say that.

> Do you see my quandary? Do I suddenly now say that, okay, she's telling the truth here today? She'd decided to finally to fully come through, she's an honest person, and she's going to tell the truth? How can I not look at you with some skepticism?

> A. Because, actually, when I took my polygraph, they asked me if I had ever whipped my daughter. And I said no. I actually passed it. And had I done any bodily harm to my

13

daughter, and I said no. And I passed it. I mean, right there's the truth.

When Christen was excused, the defense attorney moved for a mistrial given the pretrial ruling regarding polygraph evidence. The court denied the motion stating that any error in admission of polygraph evidence was invited by defense counsel. No objection was made to the ruling and no request for a curative instruction was made.

The defense called several witnesses, including the victim's father, Christen's brother and other friends and acquaintances, who primarily described the poor treatment the toddler had received from her mother and the mother's lack of genuine commitment to her. These witnesses also described Christen as an untruthful and dishonest person. Some of these witnesses also testified about how much marijuana Meadows smoked on a daily basis.

The defense also called Dr. Norman Miller to testify on the effects of drugs on a user's brain and behavior. Dr. Norman was qualified as a psychiatrist and neurologist who testified from Michigan State University via video. He offered his expert opinion that Meadows's statement to Sgt. Smith would be unreliable due to Meadow's prolonged marijuana use. He opined that this level of drug usage also could affect his ability to formulate criminal intent, and that he believed that there was a low likelihood that Meadows would be violent.

14

Meadows was the last witness to take the stand at trial. He testified that he had heavily used marijuana for five to six years. With regard to the victim's injuries, Meadows said that he had been away from the home at a friend's and upon returning to the trailer he noticed that the toddler had bruises "completely down the face." He said that on the day the toddler collapsed, Christen had hit the toddler fifteen to twenty times all over her body. He also said that Christen had admitted to slapping the toddler when she slept with her the last night of the child's life, and that Christen further admitted to having hit the toddler's head on the headboard of the bed. He further said that when Christen left to go to DHHR on November 4, she left the toddler sitting beside him on the couch. He said that he noticed something was wrong with the toddler's breathing and did not wait long before taking the toddler to Ms. Gill's trailer. He said that most of the initial statement he gave to the State Police was false.

Based upon this evidence, the jury returned a verdict of guilty of the lesser included offense of second degree murder, death of a child by a parent or custodian, and child abuse resulting in injury. A sentencing hearing was held on December 15, 2011, and a sentencing order was issued on December 20, 2011. Meadows received the sentence of a determinate period of forty years for murder in the second degree, forty years for death of a child by a custodian, and one to five years for child abuse resulting in injury, to be served concurrently. It is from the December 20, 2011, order that this appeal is taken.

15

## II.  Standard of Review

There are six issues submitted for consideration in this case.  As set forth in syllabus point two of *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997):

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

As a majority of the errors raised regard evidentiary matters, we have said that  "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).  Further pertinent standards established by this Court for review of other particular subjects raised in this appeal will be related under the discussion of  the relevant issue.

## III.  Discussion

We proceed in addressing each of the five areas in which trial court error is alleged before considering the ineffective assistance of counsel claim.

16

*A. Change of Venue*

Meadows first claims that the court below erred by transferring his trial to Monroe County without a showing of good cause. He maintains that this represents a violation of his rights under the *Constitution of West Virginia*, the *West Virginia Rules of Criminal Procedure* and the *West Virginia Code*. Meadows suggests that although this Court typically reviews rulings on a motion for change of venue under an abuse of discretion standard,[11] a de novo review is required when a trial court commits plain error[12] by not making a good cause finding before moving a trial to a new location. He maintains that such action by the trial court bears upon a substantial right as it amounts to a denial of his constitutional right to a fair trial.

Under the facts before us, we find no error. Defense counsel sought a change in venue by pretrial motion. Although the circuit court initially denied that motion, in so ruling the court made it quite clear on the record that should things change the trial would be moved to Monroe County where the people were less likely to know the defendant or have heard about the case. Subsequently, the trial court moved the trial to Monroe County. Defense counsel made no objection, either to the change in venue or to the location of trial.

---

[11]*See* Syl. Pt. 2, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946).

[12]As we stated in syllabus point seven of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), to trigger such application "there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."

17

While Meadows now asserts that the trial judge transferred the case sua sponte, it is not clear from the record before us when the trial court determined that a venue change was in order or how the parties were or were not involved in the ultimate decision to transfer the case. Meadows has not indicated what prejudice he suffered as a result of the transfer and the record does not reflect that Meadows had any difficulty in obtaining evidence or securing witnesses due to the change in trial location. These facts fall far short of demonstrating that the trial court acted unilaterally or arbitrarily by moving the location of the trial or that Meadows did not receive a fair trial as guaranteed by our State Constitution. As such, the facts before us do not trigger the application of the plain error doctrine.

The record also does not reveal an abuse of discretion. Defense counsel introduced the concern that a fair trial could not be had in the county where the offense occurred, and then raised no apparent objection either to the location selected for the trial or the reason the trial court set forth on the record for changing venue. Moreover, there is no indication in the record that the change in location caused any infirmity to the presentation of Meadows's case. Thus, any error now complained of is deemed invited. *Hopkins v. DC Chapman Ventures, Inc.*, 228 W.Va. 213, 219, 719 S.E.2d 381, 387 (2011) (recognizing the well-established principle that a party inviting a court to commit error cannot complain error was committed).

18

*B.  Polygraph Evidence*

Meadows next asserts that the trial court erred by not declaring a mistrial or offering a curative jury instruction after defense counsel elicited testimony on cross-examination of a State witness regarding the results of her polygraph testing.  Our review of a circuit court's decision to grant or deny a motion for a mistrial is reviewed under an abuse of discretion standard.  *State v. Lowery*, 222 W.Va. 284, 288, 664 S.E.2d 169, 173 (2008).  Meadows maintains that the trial court committed plain error when it allowed the unqualified admission of the polygraph results to be considered by the jury, thereby denying him his fundamental right to a fair trial.

It is well-established that "[p]olygraph test results are not admissible in evidence in a criminal trial in this State."  Syl. Pt. 2, *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979).  Therefore, error was committed when the witness, Christen, referred to a polygraph test in response to defense counsel's questioning.  However, absolutely no effort was made by defense counsel to have the initial polygraph reference withdrawn; rather, defense counsel proceeded with the line of questioning which elicited two more references to the witness's polygraph test results, without objection or request that the jury be instructed to disregard any of the testimony about a polygraph.  It was not until after the witness was excused that defense counsel moved for a mistrial.  The circuit court ruled from the bench as follows:

19

You're absolutely right . . . . I mean, we did have that pretrial ruling, that we couldn't go into the polygraph examination, the fact that there was a polygraph examination. But, you know, she made that response not in response to a State's question, but in response to your question. And I think that the manner in which you asked the question invited that response. And . . . [the prosecution] didn't have any control over the witness at that point. I mean, it was your question that brought about that response, number one. And, number two, we're talking about her polygraph examination as opposed to your client's polygraph examination.

So to the extent that there's any prejudicial error, it was invited by counsel for the defendant. So, your motion for a mistrial is denied.

Defense counsel did not then request a curative instruction nor did he offer an instruction regarding polygraph test results for inclusion in the jury charge.

This Court has indicated that a mistrial should be granted only where there is a manifest necessity for discharging the jury prior to the time it has rendered its verdict. *State v. Williams*, 172 W.Va. 295, 304, 305 S.E.2d 251, 261 (1983). We have also found that the mention of a polygraph test does not automatically result in a mistrial. *State v. Porter*, 182 W.Va. 776, 392 S.E.2d 216 (1990). With regard to our review of such matters, we said in *State v. Acord*, 175 W.Va. 611, 613-14 n.4, 336 S.E.2d 741, 744 n.4 (1985), that "our analysis of whether the mention of a polygraph test is grounds for a mistrial is the same as the analysis for any other error."

A somewhat similar situation to the one before was considered in *State v. Porter*. In that case, defense counsel also elicited the polygraph information from a State witness. Thereafter a curative instruction was given by the trial court *because* defense counsel objected to the testimony. We recognized such practice was in keeping with the long-standing principle set forth in syllabus point eighteen of *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966): "[W]here objections to questions or evidence by a party are sustained by the trial court during the trial and the jury [is] instructed not to consider such matter, it will not constitute reversible error." However, this Court has not established a hard and fast rule that a curative instruction is always required regardless if objection is raised, or that such instruction would always serve to cure the erroneous introduction of polygraph evidence. As such, trial courts are not under a "duty" as Meadows suggests to provide such an instruction sua sponte.

In view of the fact that the polygraph references in the case before us related to a witness rather than the defendant himself, we find no manifest necessity requiring the discharge of a jury by grant of a mistrial. Furthermore, while error was committed when polygraph evidence was introduced, it was not reversible error because the evidence was not elicited from or about the defendant, and defense counsel rather than the State was responsible for its introduction. Additionally, the record reflects that Meadows was not impeded from raising a challenge to Christen's veracity through the testimony of several

21

defense witnesses. Under these facts, we find that the trial court properly exercised its discretion by treating the admission of the polygraph testimony as invited error.

*C.   Child Psychologist Testimony under Rule 803(4) of the West Virginia Rules of Evidence*

The next evidentiary challenge raised by Meadows regards the admission of the psychologist's testimony about what occurred during the brother's play therapy sessions as an exception to hearsay pursuant to Rule 803(4). He maintains on appeal that Mr. Ferris's testimony represents conclusions based on "mere speculation and conjecture" as there were "no real statements" made by the brother. He claims that the psychologist's testimony consisted solely of his interpretations of the brother's activities. The State points out that these grounds were not asserted below, noting that defense counsel's objection primarily focused on the brother not being available as a witness for confrontation clause purposes, and the reliability of the brother's statements including the competency of the brother as a witness.

We find merit in the State's contention. Our review of the in camera hearing and trial court's ruling[13] regarding the use of this testimony pursuant to Rule 803(4) purposes

---

[13]According to the record, the trial court relied on *State v. Payne*, 225 W.Va. 602, 694 S.E.2d 935 (2010), when ruling the testimony admissible under Rule 803(4). The ruling included the findings that any of the statements made by the brother during play therapy were not testimonial and were not made in the context of interrogation or trial preparation, but instead were "things that took place in the context of treatment."

22

verifies that these concerns were not asserted below. Trial counsel did not argue that the testimony was not based on statements the brother made to the psychologist, that the brother's statements were inconsistent with the purpose of providing treatment, or that the statements were not relied upon by the psychologist for the purposes of treatment or diagnosis. *See* Syl. Pt. 4, *State v. Payne*, 225 W.Va. 602, 694 S.E.2d 935 (2010) (quoting Syl. Pt. 5, *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990)) (providing test for determining admissibility of evidence pursuant to Rule 803(4)). Thus, Meadows's claim of error regarding the admissibility of the opinions presented by Mr. Ferris during his testimony on play therapy with the brother is precluded from appellate review due to the failure to raise these matters before the trial court. *See W.Va. R. Evid.* R.103(a)(1). As this Court recognized in *State v. DeGraw*, 196 W.Va. 261, 272, 470 S.E.2d 215, 226 (1996),

> It is well established that where the objection to the admission of testimony is based upon some specified ground, the objection is then limited to that precise ground and error cannot be predicated upon the overruling of the objection, and the admission of the testimony on some other ground, since specifying a certain ground of objection is considered a waiver of other grounds not specified.

*D. Child Psychologist Testimony under Rule 404(b) of the West Virginia Rules of Evidence*

Meadows next challenges the admission of the psychologist's testimony under Rule 404(b). He maintains that no meaningful evidence was offered by the State during the in camera hearing sufficiently showing the psychologist's testimony would relate some

23

specific act or crime or wrong having a temporal connection to the crimes for which Meadows was standing trial.

Before admitting evidence under Rule 404(b), a trial court must hold an in camera hearing and: (1) be satisfied that the proponent has shown by a preponderance of the evidence the acts or conduct occurred and the defendant committed them; (2) find the evidence relevant under evidentiary Rules 401 and 402; (3) find the probative value of the evidence is not substantially outweighed by its prejudicial effect; and (4) issue a limiting instruction when the evidence is offered, and advisably in the court's jury charge. Syl. Pt. 2, *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994). The standard we apply to review of a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review de novo whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we consider whether the trial court's conclusion that the evidence of the collateral acts is more probative than prejudicial under evidentiary Rule 403 reflects an abuse of discretion. *State v. LaRock*, 196 W.Va. 294, 310–11, 470 S.E.2d 613, 629–30 (1996).

In this case, we find no error in the trial court's factual determination. The State had shown by a preponderance of the evidence that Meadows directed acts of physical

abuse toward both the victim and the brother. It was established that Mr. Ferris had eleven therapy sessions over the course of several months with the brother. His testimony included various examples of what the brother stated or demonstrated during the therapy, including that the brother said that Ro-Ro would "kick his butt,"and Ro-Ro would get mad when Sissy would cry. The testimony also revealed the brother demonstrated physical, violent acts between the dolls, and was protective of the Sissy doll by consistently keeping the doll as far away from the Ro-Ro figure as he could. Mr. Ferris stated "to a reasonable degree of psychological certainty" during the in camera hearing that the brother "witnessed some violence, maybe even experienced violence." Although Meadows contends that a specific act, wrong or crime was not established, we find that the evidence does demonstrate a pattern of physical abuse.

We also find that the evidence was admitted for the legitimate purposes of showing lack of mistake or accident and to identify the likely perpetrator of the injuries underlying the crimes charged. These fall within the acceptable purposes stated in the text of Rule 404(b). They are obviously appropriate reasons under circumstances where Meadows had maintained that the victim's injuries were the result of an accidental fall and the identity of the person inflicting the injuries on the toddler had not been conclusively established. Further, the trial court's conclusion that the probative value of the psychologist's play therapy testimony involving the collateral acts outweighed its prejudicial

25

effect was well-reasoned. The record also reflects that the lower court gave the appropriate limiting instruction to the jury.

Accordingly we conclude that the trial court did not abuse its discretion in finding the psychologist's testimony admissible under Rule 404(b).

*E. Photographs*

Meadows argues that the admission of twenty-seven photographs of the victim, twenty-two taken during the time she was unconscious in the hospitals and five autopsy photographs, represents an abuse of discretion. He maintains that the gruesomeness of the photos overwhelmed the jury.

Our review of the admissibility of photographs claimed to be gruesome proceeds with an examination of the evidence pursuant to Rules 401 through 403 of the *West Virginia Rules of Evidence* to ascertain whether the trial court abused its discretion. This analysis is outlined in syllabus point ten of *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994):

> Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West

Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.

Our examination of relevance pursuant to Rule 403 follows the principles outlined as follows in syllabus point nine of *Derr*:

Although Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence.

The hospital photographs in question depicted the toddler in an unconscious state, with the various tubes inserted into her body to stabilize her condition. The pictures showed bruises over the victim's entire body. The pictures were taken when the toddler was first taken to the emergency room, and every twelve hours thereafter per the instruction of the medical examiner. During his testimony, the medical examiner explained that the purpose of the series of photographs while the toddler was hospitalized was to identify the more recently inflicted blows since the bruising would continue to intensify in those areas. He also noted that the changes in bruising could have changed dramatically had the toddler lived any length of time, so the pictures served to document the child's condition closer to

27

the time of the beating.  The hospital photos were the only pictures which depicted the bruising over the victim's full body.  The five autopsy photos were head shots, focusing on the injuries inflicted on the face and brain.  Three of the five autopsy photos were views of the child's exposed brain (her face was not visible) which allowed the jury to see the depth of the bruises the toddler sustained to her head, and to understand why the medical examiner determined that those blows were most likely the cause of the child's death.  One of the pictures focused on the underside of the toddler's upper lip, which the medical examiner noted exhibited a tear in the tissue which could only be caused by a striking blow.  The remaining autopsy photo showed bruising on the victim's chin, used by the medical examiner to explain that such an array of contusions were indicative of assault rather than a medical procedure such as intubation.

While the photographs depicting the toddler from the time closest to the infliction of the fatal blows through autopsy are unquestionably disturbing, they were admissible as evidence relevant to material elements of the prosecution's burden of proof and the probative value clearly outweighed any prejudicial impact.  The autopsy photos were used to explain the force of the blows causing the child's ultimate death by showing how deeply the brain tissue itself had been damaged, negating that the child's injuries were the result of an accident or fall. The autopsy pictures of the child's lip and chin were used to dispel any misconception that the injuries were caused by anything other than forceful blows to the

child's head.  The photographs taken prior to death document the number and location of bruises on the child's entire body, and provided the fact-finder with information as to the extent of the blows which had more recently been inflicted on the child.  Accordingly, we find no error in the trial court's admission of the photographs.

## F.  Ineffective Assistance of Counsel

Ineffective assistance of counsel is the basis of Meadows's final argument in this appeal.  He maintains his trial counsel was ineffective by: (1) failing to object when the trial venue was changed; (2) repeatedly eliciting polygraph testimony from Christen, and then raising no objection or seeking any curative jury instruction; (3) allowing witnesses to provide otherwise impermissible hearsay testimony; (4) failing to lay a proper foundation for the admission of an alleged prior inconsistent statement of Christen; and (5) failing to consult with his client.

We summarized our approach to ineffective assistance of counsel claims in the context of a direct appeal in syllabus points five and six of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), and concluded:

> 5.  In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's

29

unprofessional errors, the result of the proceedings would have been different.

6. In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

In evaluating ineffective assistance claims, we are mindful that "[w]here a counsel's performance . . . arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. Pt. 21, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). As further explained in the *Miller* case, "[t]he test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately." 194 W.Va. at 16, 459 S.E.2d at 127. We additionally recognize that Meadows has the burden of proving ineffective assistance of counsel allegations by a

30

preponderance of the evidence. Syl. Pt. 22, *State v. Thomas*, 157 W.Va. at 643, 203 S.E.2d at 449.

Meadows has asserted numerous claims that his trial counsel was constitutionally ineffective. However, those claims have not been adequately developed. We are not able to conclude that the performance of Meadows's trial counsel caused the adversarial process to work inadequately. For instance, the record sheds no light on Meadows's allegation that trial counsel did not consult with him. Other of the claims may represent acceptable tactics or strategic decisions. For example, trial counsel may have elected not to request a curative instruction regarding the polygraph testimony in an effort to minimize its effect on the jury. These factors lead us to conclude that the ineffective assistance of counsel claim is not adequately developed for consideration on direct appeal. This decision, however, is made without prejudice should Meadows desire to proceed with the development of a more complete record on the issue in a petition for habeas corpus.

## IV. Conclusion

Based upon the foregoing, the December 20, 2011, order of the Circuit Court of Monroe County is affirmed.

Affirmed.