# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 19-0499**  (McDowell County 17-F-124)

**Michael Glenn Kennedy,**
**Defendant Below, Petitioner**

**FILED**

**July 30, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Michael Glenn Kennedy, by counsel Dennie S. Morgan, Jr., appeals his conviction by a jury of two counts of felony murder in the first degree and one count of nighttime burglary by breaking and entering. The State of West Virginia, by counsel Gordon L. Mowen, II, filed a response in support of the convictions.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

On November 27, 2016, just after 1:00 a.m., petitioner entered the home of his estranged wife, Jessica Daugherty, in the Coon Branch area of McDowell County, West Virginia, where he shot her and her sixteen-year-old son, Jeremy.[1] Jeremy died at the scene while Jessica was seriously wounded. Petitioner fled the home with Jessica's purse, which contained a large amount of cash. In a brief audio recording taken at the scene by law enforcement, Jessica identified petitioner as the shooter. He was eventually found in a wooded area in Wyoming County and arrested without incident.

Petitioner was transported to the West Virginia State Police detachment in Jesse, West

---

[1] Video surveillance footage showed petitioner, with his gun drawn, force himself inside the front door of the home.

1

Virginia, by Trooper David Pierson and Trooper Ralph Justus,[2] who conducted two recorded interviews of petitioner upon their arrival. In the first interview, petitioner admitted to shooting both victims, but claimed that he did so in self-defense when Jeremy pulled a gun on him "out of the blue" while petitioner and Jessica were talking in a bedroom of the home. He also admitted to taking the money that was in Jessica's purse and claimed that he used some of it to purchase drugs, which he consumed before his arrest. According to Trooper Pierson, petitioner did not appear to be confused during the interview and did not slur his words. After the first interview, Trooper Pierson left the interview room and Trooper Justus conducted a second recorded interview of petitioner. During the recorded interviews, petitioner did not claim to be under the influence of drugs such that he was not competent to make a voluntary statement. He waived his *Miranda* rights[3] before giving each of the statements. Jessica Daugherty died approximately six months after the shooting while living in a nursing home. Her autopsy concluded that she died as a result of complications from the gunshot wound injury to her head.

Petitioner was indicted in the Circuit Court of McDowell County on two counts of first-degree murder, two counts of felony murder, nighttime burglary by breaking and entering, and grand larceny. He was convicted by a jury of two counts of felony murder and one count of nighttime burglary by breaking and entering. Petitioner's post-trial motions for judgment of acquittal and new trial were denied. He was subsequently sentenced to two terms of life in prison, without the possibility of parole, on the felony murder convictions, and one to fifteen years for his nighttime burglary conviction. The sentences were ordered to run consecutively. This appeal followed.

In his first assignment of error, petitioner argues that the circuit court erred in denying his motion to suppress the recorded statements that he gave to law enforcement following his arrest. He contends that the statements were not knowingly, intelligently, and voluntarily made because (1) he made them while he was intoxicated, and (2) Trooper Justus coerced him into "confess[ing] to stuff that I didn't do." Following a suppression hearing, the circuit court denied petitioner's motion, concluding that, although petitioner may have had drugs in his system, there was insufficient evidence to find that he was intoxicated to the extent that he was not competent to make a voluntary statement and, further, that based upon the totality of the circumstances, he was, in fact, competent and both statements were voluntarily given.[4] *See State v. Bradshaw*, 193 W. Va.

_____

[2] At some point after petitioner's arrest but before the pre-trial proceedings in this case, Trooper Justus voluntarily resigned from employment with the West Virginia State Police. For ease of reference, he will be referred to as "Trooper Justus" throughout this memorandum decision.

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] According to petitioner, after the first interview but prior to the second, Trooper Justus choked and beat him in the ribs and face and, in doing so, coerced him into giving the second statement. Trooper Justus denied petitioner's claims and Trooper Pierson testified that he did not hear any noises coming from the interview room that would have suggested that Trooper Justus had assaulted petitioner. While the circuit court concluded that the second statement was not coerced and was, therefore, admissible, the State did not introduce it at trial. Therefore, the

519, 527, 457 S.E.2d 456, 464 (1995).

Given his testimony that he bought and used drugs after the shooting, petitioner argues that his statements to police were not voluntarily made because his "degree of intoxication" was "obvious," and it was "clear" that he lacked the capacity to knowingly waive his *Miranda* rights. Petitioner contends that the State failed to meet its burden of proving, by a preponderance of the evidence, that his statements to police were voluntarily given. *See* Syl. Pt. 5, *State v. Starr*, 158 W. Va. 905, 216 S.E.2d 242 (1975).

> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. Pt.1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

We find no error. The circuit court found that petitioner's speech pattern on the first recorded statement showed him to be "alert and oriented," that he "responded appropriately to the [t]roopers' questions in detail," and that he was permitted to tell his version of the events that transpired, often leading the conversation and asserting more than once that he acted in self-defense. The court specifically noted that "[t]here was not a significant difference between [petitioner's] speech pattern on the recording and his speech pattern during his testimony" at the suppression hearing. Based upon his "multiple inconsistent statements," the circuit court found petitioner's credibility to be "severely damage[d]." In contrast, the court found the testimony of Trooper Pierson, who testified that petitioner appeared to be tired but not confused, to be credible. Other than claiming that he bought and used drugs after his arrest, petitioner fails to point to any words spoken during the interview or other credible evidence to support his claim that he was so highly intoxicated during the police interviews that he could not have given the statements knowingly, voluntarily, and intelligently. We, therefore, conclude that the circuit court did not err in denying petitioner's motion to suppress.

Petitioner's second assignment of error involves a recording of a 9-1-1 call that Jessica Daugherty made several days before the crimes herein transpired that was played for the jury at trial. During the 9-1-1 call, Jessica reported that petitioner had approached her with a gun and that she was fearful that he was going to harm her. She also remarked during the call that her grandmother had previously been "beat down and murdered." Prior to trial, the circuit court ruled that Jessica's remark about her grandmother's death was inadmissible[5] but that the call was

---

question of whether the circuit court erred in denying petitioner's motion to suppress this statement is moot and will not be addressed in this appeal.

[5] It was believed by some in the victims' family that petitioner was involved in the grandmother's death. However, petitioner was never charged with a crime in connection with her death.

otherwise admissible. At trial, when the 9-1-1 call was played, the inadmissible excerpt was inadvertently played and heard by the jury. Petitioner timely moved for a mistrial. In denying the motion, the circuit court instructed the jury to disregard the remark:

> THE COURT: If the jury will remember, during voir dire there were questions asked you about if any member of your family had been the victim of a violent crime or things of that nature.
>
> You-all remember that?
>
> (Jurors nod heads and respond "yes.")
>
> THE COURT: And some of you had had some sadness in your family, as it relates to automobile accidents, accidental shootings, and then some that were just the result of a criminal act, you know.
>
> And, of course, the reason for that was because counsel wanted to make sure that those of you who may have had some violence in your past would be able to separate that from this case, because they're totally unrelated, separated incidences. You know how that words.
>
> When you listened to the 911 tape that we just heard, there as a reference to the death of I think the victim's grandmother. That's unrelated to this case. Everybody understand that?
>
> (Jurors nod heads and respond "yes.")
>
> THE COURT: Nobody is saying that Mr. Kennedy had anything to do with that.
>
> Do you-all understand that?
>
> (Jurors nod heads and respond "yes.")
>
> THE COURT: Because then she goes on and says, "I've got a DVP against my husband," and I think, you know, I can only assume that that was just to give more emphasis as to why she was more concerned about it, as to what had happened to her I guess grandmother sometime in the past but totally unrelated to this case.
>
> Do you-all understand that?
>
> (Jurors not heads and respond "yes.")
> THE COURT: Okay, can all of you-all separate that?
>
> (Jurors nod heads and respond "yes.")

4

THE COURT: I think everybody has indicated they can. Because they're – they're just unrelated. Okay? And so what –

. . . .

Well, I'm just trying to make it that we only judge this case on the facts of this case and something that may or may not happened and who, whatever, did what. Okay. But we're good to go on that; is that right? Okay.

. . . .

But just totally disregard the victim's concern about her grandmother.

On appeal, petitioner argues that he was unfairly prejudiced by the recording that was inadvertently played for the jury and that his motion for a mistrial should have been granted. "The decision to declare a mistrial, discharge the jury, and order a new trial in a criminal case is a matter within the sound discretion of the trial court." Syl. Pt. 8, *State v. Davis*, 182 W. Va. 482, 388 S.E.2d 508 (1989). Therefore, this Court reviews the circuit court's ruling for abuse of discretion. *See State v. Lowery*, 222 W. Va. 284, 288, 664 S.E.2d 169, 173 (2008).

We find no error. Notwithstanding his claim that Jessica's remark about her grandmother was "unfairly prejudicial" to him, petitioner does not suggest that the jury failed to heed the well-considered curative instruction given by the circuit court. Indeed, "[w]e normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *State v. Mahood*, 227 W. Va. 258, 264, 708 S.E.2d 322, 328 (2010). We have also cautioned that "a mistrial should be granted only where there is a manifest necessity for discharging the jury prior to the time it has rendered its verdict." *State v. Meadows*, 231 W. Va. 10, 20, 743 S.E.2d 318, 328 (2013) (citing *State v. Williams,* 172 W.Va. 295, 304, 305 S.E.2d 251, 261 (1983)). Absent any evidence or compelling argument to the contrary, we conclude that the circuit court did not abuse its discretion in denying petitioner's motion for a mistrial.

Next, petitioner argues that the circuit court erred in admitting into evidence the audio recording of Jessica Daugherty in which she identified petitioner as the shooter. Petitioner argues that the court erred in admitting this evidence pursuant to the "dying declaration" exception to the hearsay rule because Jessica survived for approximately six months following the shooting and there was evidence that she had "moments of lucidity and communication" during that time. Thus, petitioner argues, Jessica's statement could not have been made under the belief that death was imminent and, thus, it was inadmissible hearsay.

West Virginia Rule of Evidence 804(b)(2) provides:

(b) *The exceptions.* The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
 . . . .

5

(2) *Statement under the belief of imminent death.* In a prosecution for homicide or in a civil case, a statement that the declarant, while believing the declarant's death to be imminent, made about its cause or circumstances.

This Court has held that

> "[w]hat is required for a dying declaration to be admissible is that the declarant have such a belief that he is facing death as to remove ordinary worldly motives for misstatement. In that regard, the court may consider the totality of the circumstances of motive to falsify and the manner in which the statement was volunteered or elicited." Syl. pt. 3, *State v. Young,* 166 W.Va. 309, 273 S.E.2d 592 (1980), *holding modified on a different ground by State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991).

Syl. Pt. 1, *State v. Satterfield*, 193 W. Va. 503, 457 S.E.2d 440 (1995). Furthermore,

> [o]nce a trial judge determines that a statement falls within the dying declaration exception to the hearsay rule found in *W.Va.R.Evid.* 804(b)(2), then it must be determined whether the evidence is relevant pursuant to *W.Va.R.Evid.* 401 and 402 and, if so, whether its probative value is substantially outweighed by unfair prejudice pursuant to *W.Va.R.Evid.* 403. The statement is admissible only after the trial judge determines that its probative value is not substantially outweighed by unfair prejudice.

*Satterfield* at 507, 457 S.E.2d at 444, syl. pt. 3.

We find no error. The totality of the circumstances surrounding Jessica Daugherty's statement clearly favor its admissibility as a dying declaration. Senior Trooper J.C. Woods, the officer who first arrived on the scene, testified that he believed both Jeremy and Jessica to be dead. Describing the scene as "just a bloody mess[,]" he testified that Jessica had "blood coming from the back of her head and her eye had bulged out" but that she was talking and breathing. Trooper Woods quickly retrieved his recording device to obtain a statement from Jessica because it appeared that her death was imminent. Indeed, Jessica was shot twice, with one of the bullets penetrating her brain and causing one of her eyes to appear blown up. Blood was flowing from the back of her head when, in a thirty- to forty-second statement, she identified petitioner as the shooter. Though Jessica survived for six months following the shooting, the evidence established that, during that time, she was largely nonverbal, had fluid draining from her head (which became misshapen as a result of the injury), was on oxygen and feeding tubes, and had to be lifted from her bed into a high back wheelchair because she was unable to hold up her head or body. She died while being cared for in a nursing home. Given all of this evidence, we do not hesitate to agree with the circuit court that Jessica's identification of petitioner as the shooter was made because she believed her death was imminent and was, thus, a dying declaration. Finally, as to whether any unfair prejudice substantially outweighed the statement's probative value under Rule 403, *see Satterfield*, 193 W. Va. at 507, 457 S.E.2d at 444, syl. pt. 3, petitioner fails to substantively argue

that the statement was inadmissible for this reason.[6] We, therefore, conclude that the circuit court committed no error in admitting Jessica's statement into evidence under Rule 804(b)(2).

In his next assignment of error, petitioner argues that the circuit court erred in admitting evidence of a domestic violence protective order ("DVPO") that had been entered against him approximately one month before the crimes herein transpired. Petitioner states simply that the evidence violated West Virginia Rule of Evidence 404(b) and that it was more prejudicial than probative under the balancing test of Rule 403.

We find no error. Petitioner and Jessica Daugherty had lived together until September 30, 2016, when she ordered him to leave the home due to his increasing violence against her. However, petitioner continued to contact her and, in October of 2016, she applied for and was granted a DVPO against him. The DVPO application stated that petitioner had become violent, that Jessica was "terrified," and that, when she asked petitioner for a divorce, "he said the only way out was death and I would regret this." The DVPO required that petitioner have no contact with Jessica. During a *McGinnis* hearing[7] that was conducted prior to trial, the circuit court determined that the DVPO was admissible under Rule 404(b) because it "go[es] to show the identity of the person, absence of mistake or accident, as well as the motive, intent and plan [of petitioner]." On appeal, petitioner does not challenge this finding but contends simply that "the trial court erred in ruling that this [evidence] was more probative than prejudicial" and that the facts giving rise to the DVPO occurred more than one month before the shootings of Jessica and Jeremy.

This Court has instructed that when evidence is offered under Rule 404(b), "the prosecution is required to identify the specific purpose for which the evidence is being offered . . . . It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record . . . ." Syl. Pt. 1, in part, *State v. McGinnis,* 193 W. Va. 147, 455 S.E.2d 516 (1994). Further,

> [i]f a sufficient showing has been made [under Rule 404(b)], the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that

---

[6] To the extent petitioner also mentions, in passing, that the admission of Jessica's dying declaration violated his right to confront the witnesses against him, he fails to do so adequately or with any supporting legal authority or argument. This Court has made clear that "'[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.'" *State, Dep't of Health v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)). Indeed, "[a]lthough we liberally construe briefs in determining issues presented for review, . . . [issues] mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996).

[7] *See* Syl. Pt. 2, *State v. McGinnis,* 193 W. Va. 147, 455 S.E.2d 516 (1994).

the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted.

*McGinnis* at 151, 455 S.E.2d at 520, syl. pt. 2, in part.

Petitioner does not argue that the DVPO was not relevant to the prosecution's case. Rather, in a conclusory fashion, he states only that this evidence was unfairly prejudicial and, therefore, inadmissible under Rule 403. We are unconvinced. The DVPO, which was granted because petitioner threatened to kill Jessica with a gun, was highly probative of the crimes for which petitioner was being tried, as it bore directly on the ultimate issue presented at trial. Thus, we find that the circuit court did not err in admitting evidence of the DVPO at trial.

In his final assignment of error, petitioner argues that the circuit court improperly limited his cross-examination of a State's witness at trial. Petitioner sought to cross-examine Trooper Justus about whether he was forced to resign from the West Virginia State Police for "a disciplinary reason," arguing that this line of questioning was relevant to Trooper Justus's credibility. In sustaining the State's objection to defense counsel's questions, the circuit court recalled that, during the suppression hearing, defense counsel had previously been advised that "there were no findings" regarding the alleged excessive use of force by Trooper Justus in an unrelated matter.[8] On appeal, petitioner argues that the circuit court erred in precluding him from fully and fairly cross-examining Trooper Justus so that the jury could determine whether his testimony was reliable and credible.

> "'The extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in the case of manifest abuse or injustice.' Syl. pt. 4, *State v. Carduff,* 142 W.Va. 18, 93 S.E.2d 502 (1956)." Syllabus, *State v. Wood,* 167 W.Va. 700, 280 S.E.2d 309 (1981).

Syl. Pt. 12, *State v. McIntosh*, 207 W. Va. 561, 534 S.E.2d 757 (2000). We perceive no manifest abuse or injustice in the circuit court's decision to limit petitioner's cross-examination of Trooper Justus with regard to prior unfounded allegations of excessive use of force and his reasons for resigning from the West Virginia State Police. To the extent petitioner argues that the court-imposed limitation preluded him from proving that Trooper Justus physically assaulted him in order to coerce him into making an incriminating statement, the record clearly shows that defense counsel was permitted to ask (and did ask) Trooper Justus if he made physical contact with petitioner. We, therefore, find that the circuit court did not abuse its discretion in limiting defense counsel's cross-examination of Trooper Justus at trial.

For the foregoing reasons, we affirm.

Affirmed.

---

[8] Petitioner also claims that Trooper Justus had previously been accused of sexual assault, which, petitioner contends, played into his decision to resign from his employment with the West Virginia State Police.

**ISSUED:** July 30, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

**NOT PARTICIPATING:**

Justice Margaret L. Workman

9