# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2016 Term

No. 15-0343

**FILED**

**June 2, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent,**

**V.**

**JESSE LEE HEATER,**
**Defendant Below, Respondent.**

Appeal from the Circuit Court of Upshur County
Honorable Jon L. Henning, Judge
Criminal Action No. 13-F-21(a)

**AFFIRMED**

Submitted: April 13, 2016
Filed: June 2, 2016

Brian W. Bailey
Buckhannon, West Virginia
G. Phillip Davis
Arthurdale, West Virginia
Attorneys for the Petitioner

Patrick Morrisey
Attorney General
David A. Stackpole
Assistant Attorney General
Charleston, West Virginia
Attorneys for the Respondent

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt.  Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt."  Syllabus point 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

2.      "The authority of a trial court in a criminal case to remove a court-appointed attorney on the court's own motion, over the objection of the defendant and the attorney, is severely limited and must be supported by specific findings and conclusions placed on the record.  The removal of a court appointed attorney shall be subject to an abuse of discretion standard upon review by this Court."  Syllabus point 4, *State v. Fields*, 225 W. Va. 753, 696 S.E.2d 269 (2010).

3.      """The question as to whether or not a juror has been subjected to improper influence affecting the verdict[] is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial,

i

proof of mere opportunity to influence the jury being insufficient." Syllabus Point 7, *State v. Johnson*, 111 W. Va. 653, 164 S.E.2d 31 (1932).' Syllabus Point 1, *State v. Sutphin*, 195 W. Va. 551, 466 S.E.2d 402 (1995)." Syllabus point 1, in part, *Lister v. Ballard*, No. 15-0028, ___ W. Va. ___, ___ S.E.2d ___, 2016 WL 857695 (Mar. 2, 2016).

4.     "'In any case where there are allegations of any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before the jury not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial with full knowledge of the parties; it is the duty of the trial judge upon learning of the alleged communication, contact, or tampering, to conduct a hearing as soon as is practicable, with all parties present; a record made in order to fully consider any evidence of influence or prejudice; and thereafter to make findings and conclusions as to whether such communication, contact, or tampering was prejudicial to the defendant to the extent that he has not received a fair trial.'  Syllabus Point 2, *State v. Sutphin*, 195 W. Va. 551, 466 S.E.2d 402 (1995)." Syllabus point 2, *Lister v. Ballard*, No. 15-0028, ___ W. Va. ___, ___ S.E.2d ___, 2016 WL 857695 (Mar. 2, 2016).

5.     "A trial court has discretionary authority to bifurcate a trial and sentencing in any case where a jury is required to make a finding as to mercy." Syllabus point 4, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

6.     "The State of West Virginia, through a prosecuting attorney, has standing to move for disqualification of defense counsel in a criminal proceeding in limited circumstances where there appears to be an actual conflict of interest or where there is significant potential for a serious conflict of interest involving defense counsel's former (or current) representation of a State witness." Syllabus point 3, *State ex rel. Blake v. Hatcher*, 218 W. Va. 407, 624 S.E.2d 844 (2005).

7.     "The type of evidence that is admissible in the mercy phase of a bifurcated first degree murder proceeding is much broader than the evidence admissible for purposes of determining a defendant's guilt or innocence. Admissible evidence necessarily encompasses evidence of the defendant's character, including evidence concerning the defendant's past, present and future, as well as evidence surrounding the nature of the crime committed by the defendant that warranted a jury finding the defendant guilty of first degree murder, so long as that evidence is found by the trial court to be relevant under Rule 401 of the West Virginia Rules of Evidence and not unduly prejudicial pursuant to Rule 403 of the West Virginia Rules of Evidence." Syllabus point 7, *State v. McLaughlin*, 226 W. Va. 229, 700 S.E.2d 289 (2010).

8.     Whether or not to make a motion for a bifurcated mercy proceeding pursuant to *State v. La*Rock, 196 W. Va. 294, 470 S.E.2d 613 (1996), is a matter of strategy

iii

and tactics and is thus a decision to be made by the parties and their advocates. A trial court does not have a duty to *sua sponte* order bifurcation.

**Davis, Justice:**

Petitioner, Jesse Lee Heater ("Mr. Heater"), was convicted in the Circuit Court of Upshur County of murder in the first degree; conspiracy to commit murder; concealment of a deceased human body; and conspiracy to conceal a deceased human body. The jury did not add a recommendation of mercy to its verdict. Accordingly, Mr. Heater was sentenced to life imprisonment without possibility of parole, as well as three one-to-five year terms of imprisonment, all terms set to run consecutively.

On appeal, Mr. Heater raises three assignments of error. First, he alleges that he was denied his constitutional right to counsel of his choice. Second, he alleges that the trial court erred in denying his request to poll the jury to determine whether any members of the panel had spoken to a protester who was sitting in or near the courtroom. Third, he alleges that the trial court erred in failing to *sua sponte* order bifurcation of the penalty phase of the trial.

After careful review of the record, the parties' briefs and arguments, and the applicable law, we affirm.

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

This portion of the opinion is divided into two sections. We first relate the underlying facts of the case. We then iterate the relevant pretrial and trial proceedings.

### A. *Facts of the Case*

At the outset, we note that although Mr. Heater attempts to reargue the facts of the case in his brief, particularly with respect to the veracity of co-conspirator/witness Robert Eugene Siron, III, it is well established that,

> [t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). *See also State v. McCoy*, 219 W. Va. 130, 135, 632 S.E.2d 70, 75 (2006); *State v. Ladd*, 210 W. Va. 413, 424, 557 S.E.2d 820, 831 (2001). Further, "[c]redibility determinations are for a jury and not an appellate court." *State v. Beegle*, No. 15-0302, ___ W. Va. ___, ___ S.E.2d ___, Slip. Op. at 4 (Apr. 21, 2016) (citing Syl. pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163).

2

This case presents a tangled skein of relationships. On January 23, 2013, Robert Eugene Siron, III ("Siron"), upon realizing that after a morning spent gambling what remained in his pay packet was not sufficient to cover the vehicle loan payment due that day, decided to buy a six-pack of beer and spend the day "driving around drinking" and avoiding going home to face his wife. During his travels that day, he came upon his cousin, Mr. Heater, who asked if he could come along. Siron agreed and bought a case of beer for the two men to share.

Some time later, Mr. Heater asked Siron to drive to the home of Josh Oberg ("Oberg"), and Siron agreed. Mr. Heater represented to Siron that Oberg, whom Siron had never met, was a casual friend from work. What Mr. Heater did *not* tell Siron was that Oberg was having an affair with Kelli Villagomez Correa ("Kelli"), another cousin of the two men, and that Kelli's husband had agreed to pay Mr. Heater $5,000.00 to kill Oberg.

Mr. Heater and Siron spent some time at Oberg's apartment drinking beer and talking about video games, apparently a shared interest, after which the three men went out for cigarettes. On the way back, Mr. Heater "pull[ed] out a bag of weed" and suggested that the three go somewhere else to get high. Siron and Oberg agreed, and Mr. Heater directed Siron to drive to a remote spot in rural Upshur County known as Hog Hollow. Once there and out of the truck, everyone smoked some marijuana and drank some more beer, after

3

which Siron started walking back toward the vehicle because he was feeling the effects of a full day of drinking. Mr. Heater and Oberg were out of Siron's sight, but Siron suddenly "saw a bright flash and heard a boom . . . like a firecracker had gone off, and heard a sound like a bag of potatoes hitting the floor." He heard Oberg ask "[w]hy?" several times, and heard Mr. Heater respond "[t]hat's what you get for f\*\*ing someone's wife."

A panicked Siron began running toward the truck, but Mr. Heater tackled him, pistol-whipped him, and put a gun to his chin, telling him that, if he did not help dispose of Oberg's body, he would be dead too. The two men put Oberg's body into the back of the truck and took off at a high rate of speed. After passing another vehicle on the road, they stopped to cover up the body with some cardboard. Thereafter, they made several additional stops – to buy a shovel, to buy some more beer, and to use a "porta-potty" – and then drove to Bull Run Road, another rural area with no houses and very little traffic.

At Mr. Heater's direction, Siron dug a shallow grave,[1] and Oberg's body was placed in it. Mr. Heater used Siron's phone to take a picture of the body, after which Siron filled in the grave, and the two men headed to Siron's house. During the trip, Mr. Heater used Siron's phone again, this time to make a phone call in which he announced that "[i]t's

---

[1]Siron testified that Mr. Heater wanted him to dig a deeper hole, but Siron would not do it because he was afraid he would be joining Oberg if the grave could accommodate two bodies.

4

done."

The next day, Mr. Heater and Siron began the process of destroying any evidence of what had happened. They took all of their clothing and everything burnable from the truck, put it on a burn pile, and "set it all on fire." Mr. Heater had two Zippo lighters that he had taken from Oberg, as well as a knife with blood on it,[2] all of which he threw into the river behind Siron's house. Although Mr. Heater wanted to burn the truck, Siron convinced him that they could just burn the bed liner, which they did on yet another burn pile. They hid the shovel and some concrete blocks that had been in the truck behind the steps at a friend's home (without the friend's knowledge). They drove back to the scene of the killing where they disposed of their beer bottles and "churned the earth up" to cover a large spot of blood. They searched for, but could not find, their "spent brass." Finally, to account for the fact that they might well have been seen riding around with Oberg on the day of Oberg's murder, they concocted a story about dropping Oberg off at a bowling alley and seeing him get into a green Jeep.

---

[2]It is apparent from Siron's testimony that he believed Mr. Heater had stabbed Oberg as well as shot him, although it is unclear whether he saw this or just inferred it from the existence of the bloody knife. When Oberg's body was finally recovered, it was so badly decomposed that the Medical Examiner could not determine whether Oberg had sustained any stab wounds, a fact defense counsel emphasized as evidence of Siron's unreliability as a witness.

On the second day after Oberg's murder, Mr. Heater had Siron drive him to a Mexican restaurant owned[3] and operated by Rodolfo "Chino" Villagomez Correa ("Villagomez Correa"). Mr. Heater went to talk to Villagomez Correa, taking Siron's phone with him, and then motioned to Siron to come to the counter because he was having a problem finding the picture of Oberg's body. Siron brought up the picture, whereupon Villagomez Correa became "upset that he couldn't see [Oberg's] face." Mr. Heater told Villagomez Correa that "[i]t's him, it's him," and "[t]rust me, you'll never see him again, it's him." Mr. Heater and Villagomez Correa both told Siron that he "was part of this now and if [he] ever said anything, they wouldn't just come after [him], they would come after [his] son and [his] wife." Villagomez Correa handed Mr. Heater an envelope containing money, from which Mr. Heater later took $500.00 and gave it to Siron with final instructions to Siron to "[j]ust shut up, it'll be fine, shut up."

But murder will out, as Macbeth famously observed, and, six months later, authorities, acting on a tip from a confidential informant, discovered the "very very decomposed and partially skeletonized" remains of Oberg. On or about July 24, 2012, Mr. Heater, Siron, and Villagomez Correa were arrested and charged with murder for hire.[4]

_____

[3]The title to the restaurant was held in the name of a third party since Villagomez Correa was not an American citizen.

[4]Siron eventually entered pleas of guilty to voluntary manslaughter and concealment of a deceased body, while Villagomez Correa entered pleas of guilty to second

(continued...)

6

## B. Relevant Pretrial and Trial Proceedings

Attorney James E. Hawkins, Jr. ("Mr. Hawkins"), was initially appointed to represent Mr. Heater, and appeared in that capacity at the bond hearing, the preliminary hearing, and through and after Mr. Heater's indictment in January 2013. However, on June 19, 2013, the State filed a motion asking the court to conduct a hearing to determine whether Mr. Hawkins should be disqualified on the ground that he had previously represented a witness "who states that he [the witness] has knowledge of inculpatory statements made by [Mr. Heater] regarding the crimes alleged in this case." Mr. Hawkins' initial response to the motion was to resist it, noting that Mr. Heater "vehemently objects to me being removed from his case," and further that "this is the third time now this has happened to me in a murder case." Mr. Hawkins asked for time to investigate the alleged conflict of interest and thereafter for an evidentiary hearing, if necessary. The court granted this request.

At a hearing held two days later, Mr. Hawkins informed the court that he had reviewed the recorded statement of the State's witness and that "I have represented, I know, on at least five occasions and am still involved in a case, not representing him, but representing his ex-wife, with whom he still maintains contact, so I still have contact through him, potentially as a witness in that case, assisting her." Because the State intended to call

---

[4](...continued)
degree murder and conspiracy to commit murder.

7

the witness at trial,[5] Mr. Hawkins concluded that he had "no other recourse than . . . to respectfully, although reluctantly, ask the Court to be permitted to withdraw as counsel in [this] case." Significantly, Mr. Hawkins informed the court that

> I'd really like to stay on this case. [Mr. Heater] would really like to keep me in this case. I'm invested in it as far as being prepared and working on it, and trying to go forward. However, when I take that and consider it in conjunction with the ethical rules of professional conduct, *I don't see how I can avoid this conflict, and have gone every which way around the block trying to find a way and I just don't see how I can do that*.

(Emphasis added). The court granted Mr. Hawkins' request to withdraw from the case and appointed new counsel, Thomas Dyer and Zachary Dyer.

On the first morning of trial, the court was informed that a Ms. Stout was in the aisle of the courtroom, in a motorized chair, wearing what has been variously described as a "sign" or a "campaign-style button" containing a picture of her son, Luke Stout, with the word "Missing."[6] The court instructed Ms. Stout to remove the sign/button and to give it to the bailiff "because the Court's not going to allow any evidence or any notion or anything to enter into this trial that deals with the disappearance of your son." Because the jury had

---

[5]The State did in fact call the witness, James Roy, who testified that while he and Mr. Heater were in jail together, he heard Mr. Heater state that he had killed Oberg for $5,000.00 and had given Siron $500.00.

[6]Although Mr. Heater claims in his brief that "[m]any folks in the community have associated [Luke Stout's] disappearance with the Petitioner, Jesse Heater, based on Mr. Heater's alleged involvement in the present murder case involving Mr. Oberg," the Appendix Record contains scant evidence to support this assertion. *See* text, Section III. B., *infra*.

8

filed into the courtroom close to where Ms. Stout was sitting, Mr. Heater's counsel requested that the jurors be questioned "about whether [Ms. Stout] had a conversation with any of the jurors on her way in." The court was reluctant to question the jurors and instead questioned the bailiff who had been with them as they entered the courtroom. The bailiff stated that he, himself, had seen the sign/button that Ms. Stout was wearing and that the jurors could possibly have seen it, but that none of the jurors had had any contact or conversation with Ms. Stout. Satisfied, the court declined to question the jurors, and warned Ms. Stout in no uncertain terms that any more signs or buttons, or any disturbance or outburst or disruption of any kind, would result in her ejection from the courtroom.

At no time during the foregoing proceedings did Mr. Heater request that the court grant a mistrial, give an instruction to the jury, or take any other curative action with respect to any issues involving Ms. Stout's presence at the trial.

The case was tried as a unitary proceeding, as neither the State nor Mr. Heater moved to bifurcate the issue of mercy. The State called twenty-four witnesses[7] and tendered forty-five exhibits for the jury's consideration. Mr. Heater did not put on a case in chief, but rather relied on cross-examination of the State's witnesses to establish his primary theories

_____

[7]One witness, Mr. Villagomez Correa, was called to the stand outside the presence of the jury and asserted his Fifth Amendment privilege against self-incrimination.

of defense: that the accomplice/witness, Siron, was not credible; that all of the physical evidence in the case pointed to Siron as Oberg's killer, not Mr. Heater; that the State had failed to put on any scientific evidence such as DNA or fingerprint evidence; that neither the gun[8] nor the knife admitted into evidence could be established as the murder weapon(s); and that James Roy, the jailhouse informant, was unworthy of belief because he had a previous conviction for providing false information to authorities.

Following instructions, closing arguments, and deliberations, the jury convicted Mr. Heater of all charges in the indictment and did not add a recommendation of mercy to its verdict. At Mr. Heater's initial sentencing hearing held on August 14, 2014, the court noted that the facts of this murder for hire case were egregious; that Mr. Heater had previously been convicted of four crimes involving domestic violence, two of them felonies; and that "[i]t doesn't take a whole lot of additional information to indicate to this Court that you are a very violent and dangerous person." Accordingly, the court sentenced Mr. Heater to life imprisonment without possibility of parole on the murder conviction; and one-to-five year terms of imprisonment for his convictions of conspiracy to commit murder, concealment of a deceased human body, and conspiracy to conceal a deceased human body. All terms

---

[8]Sometime after Oberg's murder, Mr. Heater sold a gun to witness Melissa Frye, which Ms. Frye then turned over to the police. Although Siron testified that this gun appeared to be the weapon with which he had been pistol-whipped by Mr. Heater, forensic experts could not establish that it was the weapon used to shoot Oberg.

10

were set to run consecutively.

On February 11, 2015, Mr. Heater was resentenced for the specific purpose of preserving his appeal rights.[9] After considering and denying Mr. Heater's Motion in Arrest of Judgment, Motion for Post-Verdict Judgment of Acquittal, and Motion for New Trial, the court resentenced Mr. Heater consistent with the originally imposed sentence. This appeal followed.

## II.

### STANDARD OF REVIEW

With respect to Mr. Heater's first assignment of error, that his Sixth Amendment rights were violated when the court disqualified his original attorney, Mr. Hawkins, this Court has held that,

> [t]he authority of a trial court in a criminal case to remove a court-appointed attorney on the court's own motion, over the objection of the defendant and the attorney, is severely limited and must be supported by specific findings and conclusions placed on the record. The removal of a court appointed attorney shall be subject to an abuse of discretion standard upon review by this Court.

Syl. pt. 4, *State v. Fields*, 225 W. Va. 753, 696 S.E.2d 269 (2010).

---

[9]Mr. Heater had filed a complaint against his trial counsel, necessitating the appointment of new counsel who then needed time to "get up to speed" and thereafter file post-trial motions and an appeal.

11

With respect to Mr. Heater's second assignment of error, that the court erred in failing to *sua sponte* declare a mistrial or give a curative instruction after a spectator appeared in the courtroom wearing a sign or button that referenced "a missing person whose disappearance had nothing to do with [Mr. Heater's] trial," we recently reaffirmed that

> "'[t]he question as to whether or not a juror has been subjected to improper influence affecting the verdict, is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial, proof of mere opportunity to influence the jury being insufficient.' Syllabus Point 7, *State v. Johnson*, 111 W. Va. 653, 164 S.E.2d 31 (1932)." Syllabus Point 1, *State v. Sutphin*, 195 W. Va. 551, 466 S.E.2d 402 (1995).

Syl. pt. 1, in part, *Lister v. Ballard*, No. 15-0028, ___ W. Va. ___, ___ S.E.2d ___, 2016 WL 857695 (Mar. 2, 2016). Further,

> [i]n any case where there are allegations of any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before the jury not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial with full knowledge of the parties; it is the duty of the trial judge upon learning of the alleged communication, contact, or tampering, to conduct a hearing as soon as is practicable, with all parties present; a record made in order to fully consider any evidence of influence or prejudice; and thereafter to make findings and conclusions as to whether such communication, contact, or tampering was prejudicial to the defendant to the extent that he has not received a fair trial. Syllabus Point 2, *State v. Sutphin*, 195 W. Va. 551, 466 S.E.2d 402 (1995).

Syl. pt. 2, *Lister v. Ballard*, No. 15-0028, ___ W. Va. ___, ___ S.E.2d ___, 2016 WL 857695.

12

Finally, with respect to Mr. Heater's third assignment of error, that the court erred in failing to *sua sponte* order bifurcation of the mercy issue, we have held that "[a] trial court has discretionary authority to bifurcate a trial and sentencing in any case where a jury is required to make a finding as to mercy." Syl. pt. 4, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

Having perused the standards for our review of this case, we proceed to address the issues raised.

### III.

### DISCUSSION

In our discussion below, we will first address Mr. Heater's assertion that the circuit court erred by removing his appointed counsel. We then will consider his argument that the circuit court wrongly failed to, *sua sponte*, take certain actions to resolve improper jury influence that *may* have occurred during trial. Finally, we will scrutinize Mr. Heater's claim that the circuit court failed to *sua sponte* order bifurcation of the mercy phase of his trial

### *A. Removal of Defense Counsel*

Mr. Heater alleges that the trial court committed "grave Constitutional error" when it "bowed to the wishes of the State of West Virginia" and removed his appointed

13

counsel, Mr. Hawkins, from the case. Indeed, Mr. Heater goes so far as to claim that "[b]ecause the State feared the result should Mr. Hawkins continue to represent [Mr. Heater], they used whatever pre-text (sic) was necessary to see to it that he was removed as counsel, as was their habit in murder cases." We have carefully examined the record in this case and find that while this issue is replete with overblown prose, it lacks any factual basis. For this reason, we will give the matter no more than the brief attention it merits.

We begin by examining the underpinning of any argument involving the removal of a criminal defendant's counsel: the right to counsel as set forth in the Sixth Amendment to the United States Constitution, and in art. III, § 14 of the West Virginia Constitution. In its most recent Sixth Amendment decision, the United States Supreme Court reaffirmed that "the constitutional right at issue here is fundamental: '[T]he sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire.'" *Luis v. United States*, ___ U.S. ___, ___,136 S. Ct. 1083, 1089, ___ L. Ed. 3d ___ (2016) (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 109 S. Ct. 2646, 2652, 105 L. Ed. 2d 528 (1989)).[10] The Court noted, however, that,

---

[10]Justice Thomas, concurring, wrote that, "[a]s understood in 1791, the Sixth Amendment protected a defendant's right to retain an attorney he could afford." *Luis v. United States*, ___ U.S. ___, ___,136 S. Ct. 1083, 1098, ___ L. Ed. 3d ___ (2016) (Thomas, J., concurring).

14

> [t]his 'fair opportunity' for the defendant to secure counsel of choice has limits.  A defendant has no right, for example, to an attorney who is not a member of the bar, or who has a conflict of interest due to a relationship with an opposing party.  And an indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice.

*Luis*, ___ U.S. ___, ___,136 S. Ct. 1083, 1089, ___ L. Ed. 2d ___ (2016) (internal citations omitted).

Consistent with federal jurisprudence, this Court's cases have made it clear that under both the Sixth Amendment and W. Va. Const., art. III, § 14, "the right to choice of counsel is not absolute."  *State ex rel. Blake v. Hatcher*, 218 W. Va. 407, 413, 624 S.E.2d 844, 850 (2005).  Significantly, where a disqualification issue arises from a conflict of interest on the part of defense counsel,

> [t]he State of West Virginia, through a prosecuting attorney, has standing to move for disqualification of defense counsel in a criminal proceeding in limited circumstances where there appears to be an actual conflict of interest or where there is significant potential for a serious conflict of interest involving defense counsel's former (or current) representation of a witness.

Syl. pt. 3, *State ex rel. Blake v. Hatcher*, 218 W. Va. 407, 624 S.E.2d 844.  In such cases, the trial court has broad discretion to disqualify counsel even if the interested parties have waived the conflict.  *State ex rel. Michael A.P. v. Miller*, 207 W. Va. 114, 529 S.E.2d 354 (2000).  *See also State ex rel. Doe v. Troisi*, 194 W. Va. 28, 459 S.E.2d 139 (1995) (stating

15

general principle that court may remove counsel notwithstanding client's waiver of counsel's conflict of interest). This discretionary standard "arises from a trial court's duty to assure that criminal defendants receive fair trials, which must be balanced with a defendant's right to counsel of his or her own choice." *Miller,* 207 W. Va. at 120, 529 S.E.2d at 360 (internal citations omitted). The basis of this duty is the court's "institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver." *Id.* (citing *United States v. Stewart*, 185 F.3d 112, 122 (3d Cir. 1999)).

With this legal framework in mind, we turn now to the facts of this case. First, nothing in the record indicates that the State's motion was made in bad faith; the State merely pointed out the existence of a possible conflict of interest on the part of Mr. Heater's counsel and asked the court to hold a hearing on the matter. The conflict, as counsel acknowledged after investigation, was actual, not potential or speculative; Mr. Heater's counsel had represented witness James Roy on multiple occasions in the past, and Mr. Roy was a critical witness against Mr. Heater in this case.

Second, nothing in the record backs up Mr. Heater's claim that the State's motion to determine whether defense counsel should be disqualified was something done as "a matter of habit in murder cases." During the initial hearing on this issue, Mr. Hawkins

16

noted that "this is the third time now this has happened to me in a murder case, so I'm not

– you know, I'm just saying, for what it's worth."  The court responded:

> All right, sir.  Well, all right, the – well, certainly, Mr. Hawkins you know, one of the – this may be another murder case that you're removed from, but you know, there is a relatively small Bar around here and you are – well-known as a criminal defense attorney.  In fact, as far as I know, that's the only work that you do, is criminal defense and juvenile work.  So for there to be these conflicts is not – it's perhaps regrettable, but it's not surprising.

Third, after Mr. Hawkins requested, and was granted, an opportunity to review

the relevant facts, he acknowledged that he did indeed have a conflict of interest.[11]

> So I have tried to do everything possible to avoid being conflicted out of this case.  As the Court is aware, I have a really good rapport with [Mr. Heater].  I have represented him in the past and we had good results in that case, so the long and short of it is, Your Honor, I'd really like to stay on this case.  [Mr. Heater] would really like to keep me in this case.  I'm invested in it as far as being prepared and working on it, and trying to go forward.  However, when I take that and consider it in conjunction with the ethical rules of professional conduct, I don't see how I can avoid this conflict, and have gone every which way around the block trying to find a way and I just don't see how I can do that.
>
> So, unfortunately, at this point in time, I feel that I have no other recourse other than, after this conflict is brought to the Court's attention, *to respectfully, although reluctantly, ask the*

---

[11]Although Mr. Heater claims that he was willing to waive the conflict, he fails to consider that James Roy would have had to waive it as well, something that Mr. Roy had no incentive to do and every reason *not* to do.

*Court to be permitted to withdraw as counsel in the case* and to seek the Court to find, as quickly and practically as possible, substitute counsel to assist [Mr. Heater] so the case can go forward.

(Emphasis added). The court granted Mr. Hawkins' motion to withdraw and promptly appointed substitute counsel to represent Mr. Heater.

Fourth, and finally, although Mr. Heater argues at length that the substitute counsel did a poor job representing him, we find this to be irrelevant to the issue at hand. If Mr. Heater believes that the end result of Mr. Hawkins' disqualification from the case was that he, Mr. Heater, received ineffective assistance from substitute counsel, the proper vehicle for raising this claim is a petition for writ of habeas corpus.[12]

---

[12]In this regard,

[w]e have urged counsel repeatedly to think of the consequences of raising this issue on direct appeal. Claims that an attorney was ineffective involve inquiries into motivation behind an attorney's trial strategies. *See State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). Without such facts trial counsel's alleged lapses or errors will be presumed tactical moves, flawed only in hindsight. What is more, in the event a defendant pursues his claim on direct appeal and it is rejected, our decision will be binding on the circuit court through the law of the case doctrine, "leaving [defendant] with the unenviable task of convincing the [circuit court] judge that he should disregard our previous ruling." *U.S. v. South*, 28 F.3d 619, 629 (7th Cir. 1994). This is why in *Miller* we suggested that a defendant who presents an ineffective assistance claim on direct appeal has little to gain and everything to lose.

(continued...)

18

In summary, it is readily apparent that Mr. Heater's Sixth Amendment issue is sound and fury, signifying nothing. The State had the right to seek disqualification of defense counsel, and there is no reason to believe that its motion was made in bad faith. Thereafter, the trial court did not abuse its discretion in granting Mr. Hawkins' request for leave to withdraw, where said request was made on the basis of Mr. Hawkins' concession that he had an actual conflict of interest and no "way around the block" to avoid it.

## B. *Improper Juror Influence*

Mr. Heater claims that the court below erred in failing to *sua sponte* poll the jury, give a curative instruction, or grant a mistrial, after a spectator appeared in the courtroom wearing a sign or button that referenced "a missing person whose disappearance had nothing to do with [Mr. Heater's] trial."

This Court recently reiterated that

> [t]he question as to whether or not a juror has been subjected to improper influence affecting the verdict[] is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial, proof of mere opportunity to influence the jury being insufficient.

Syl. pt. 1, in part, *Lister v. Ballard,* No. 15-0028, ___ W. Va. ___, ___ S.E.2d ___, 2016 WL

---

[12](...continued)
*State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 317 n.1, 465 S.E.2d 416, 419 n.1 (1995).

19

857695 (internal citations omitted). With this legal framework in mind, we examine the facts.

As noted earlier, the spectator in question was a Ms. Stout, who was sitting in the courtroom in a motorized chair, displaying a sign or button[13] containing a picture of her son, Luke Stout, and the caption "Missing." The record indicates that the trial court was concerned about the possibility that Ms. Stout and/or her companions might cause a disruption during the trial; he instructed Ms. Stout to give her sign/button to the bailiff, and admonished her that "the Court's not going to allow any evidence or any notion or anything to enter into this trial that deals with the disappearance of your son . . . [t]his case is not about the disappearance of your son."

The only other mention of Luke Stout occurred during voir dire, when the court had the following exchange, outside the presence of the other jurors, with potential juror Thorne.

> BY THE COURT: Okay, Ms. Thorne, when you say you're not sure, again, there is no right or wrong answer, but we need to know for sure. I mean, and I don't know what you heard, seen or heard in the news, but you understand that the Defendant starts the trial he's presumed to be innocent, do you understand

---

[13]The parties use both of these words, and the record provides only one clue: that the offending object, whatever it was, was approximately "six inches diameter, maybe, something like that."

that?

JUROR THORNE:  Yeah.

BY THE COURT:  And that stays with him until the State proves otherwise do you understand that?  Could you set aside this opinion that you have or this – I don't even know to what degree you have formed an opinion.  Can you tell me to what degree you have formed an opinion?

JUROR THORNE: – like at the time that it happened, there was just a lot of comments –

BY THE COURT:  Sure.

JUROR THORNE: – cannot tell you – (inaudible) – it kind of made me think yeah, he – (inaudible)

BY THE COURT:  Mr. Dyer [defense counsel] might.  To the Court it really, you know, matters less that – you know, it matters more that you – you know, to know whether you can set it aside.

JUROR THORNE:  (Inaudible)

BY THE COURT:  Sure.

JUROR THORNE: – Luke Stout, my mom had him in the first grade and I – (inaudible)

BY THE COURT:  So you have a pretty good knowledge about what all – you know, some of the allegations and some of the side stories are –

JUROR THORNE:  Yeah.

Shortly after this exchange, and after Ms. Thorne continued to express doubts

21

about her ability to be impartial, the court struck her for cause.

Neither the court's exchange with Ms. Stout, nor the court's exchange with potential juror Thorne, occurred in the presence of the jury. However, as stated earlier, at the beginning of the trial the jurors, accompanied by the bailiff, walked by Ms. Stout, causing Mr. Heater to request that they be questioned "about whether [Ms. Stout] had a conversation with any of the jurors on her way in." The court, reluctant to introduce the subject of Luke Stout into any exchange with the jurors, decided to question the bailiff instead.

> BY THE COURT: Okay. As far as you know, did any of [the jurors] look down at Ms. Stout?
>
> CHIEF DEPUTY MILLER: Not as far as I know.
>
> BY THE COURT: Was there any eye contact with Ms. Stout?
>
> CHIEF DEPUTY MILLER: Not as I'm aware of.
>
> BY THE COURT: Okay. I guess my question is why – did anybody see that sign on her before she came into the Courtroom?
>
> CHIEF DEPUTY MILLER: Yes, sir, I saw it.
>
> BY THE COURT: Okay, well, I wish somebody would have informed me of that and taken that away from her before we brought the jury out, but is it your belief that anybody had made contact with her or had any conversation with her, no matter how brief?
>
> CHIEF DEPUTY MILLER: No, the jury was secluded, sir.

Based on these assurances, the court declined to question the jurors. Ms. Stout sat quietly

and unadorned with signs or buttons throughout the remainder of the trial (if indeed she even stayed, which cannot be ascertained from the record), and the trial proceeded.

In a hearing on Mr. Heater's post-trial motion for a new trial, Chief Deputy Miller was again questioned about the matter, this time under oath. He reiterated that although the jurors could possibly have seen Ms. Stout's button, they would have had to look down in order to do so (Ms. Stout being in a motorized chair), and he did not see any of the jurors do that: "The jury seemed, if I may say, they seemed to focus on coming into the Courtroom as they were instructed. They weren't looking around. . . ." Further, Deputy Miller testified unequivocally that "[n]obody said a word as the jury went through." Based on this testimony, the court ruled again that "[t]here is no evidence that [the sign/button] was even observed by the jury, much less that it had any prejudicial effect upon the jury."

Mr. Heater alleges that the court was required to take some curative action after the jury had filed past Ms. Stout: individual questioning of the jurors, a curative instruction, or a mistrial. We disagree. The circumstances of the case show nothing more than a possibility that the jurors might have seen Ms. Stout's sign/button and been influenced by it, which is clearly insufficient under *Lister v. Ballard,* No. 15-0028, ___ W. Va. ___, ___ S.E.2d ___, 2016 WL 857695, to sustain a claim that the jury was tainted. In this regard, we find that the three cases upon which Mr. Heater relies are wholly inapposite.

23

In *State v. Franklin*, 174 W. Va. 469, 327 S.E.2d 449 (1985), the defendant was indicted and tried for the offense of driving under the influence of alcohol, resulting in death. W. Va. Code § 17C-5-2(a). On the first morning of trial, the Sheriff handed a potential juror a large, bright yellow lapel button bearing the acronym MADD (Mothers Against Drunk Driving). Although the potential juror was excused and the Sheriff "censured," whatever that might have meant, nonetheless the Sheriff and ten to thirty MADD demonstrators remained in court throughout the trial, all prominently displaying their yellow MADD buttons and all sitting directly in front of the jury. The court refused to grant defense counsel's repeated requests for a mistrial, refused to order the spectators to remove their buttons, and refused to take any other action against the overwhelming MADD presence in the courtroom. On these facts, this Court reversed, holding that,

> [t]his Court quite simply cannot state that the mere presence of the spectators wearing MADD buttons *and the pressure and activities of the uniformed sheriff leading them* did not do irreparable damage to the defendant's right to a fair trial by an impartial jury. Indeed, it constitutes reversible error.

*State v. Franklin*, 174 W. Va. at 475, 327 S.E.2d at 455 (emphasis added).

Mr. Heater next relies upon *State v. Moss*, 180 W. Va. 363, 376 S.E.2d 569 (1988). In *Moss*, several weeks into the defendant's lengthy trial, the prosecuting attorney did a radio interview in which he made inflammatory statements about the case, including the statement that "[n]o doubt in my mind that he in fact is the murderer of Vanessa Reggettz

24

and her two children." *Id*. at 366, 376 S.E.2d at 572. The court refused to poll the jury as to whether any of the jurors had heard the interview, "stating that he had confidence that the jurors had complied with his admonition to avoid radio, newspaper, and television accounts of the case while the court was in recess." *Id*. This Court reversed, first finding that "[i]t is improper for a prosecutor in this State to [a]ssert his personal opinion . . . as to the guilt or innocence of the accused. . . ." *Id*. at 367, 376 S.E2d at 573 (citing Syl. pt. 3, *State v. Critzer*, 167 W. Va. 655, 280 S.E.2d 288 (1981)). We then held that "[i]f it is determined that publicity disseminated by the media during trial raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material." *Id*. (citing Syl. pt. 5, *State v. Williams*, 172 W. Va. 295, 305 S.E.2d 251 (1983)). Finally we held that "where publicity has been disseminated which raises a serious question of possible prejudice and either party has made a motion to poll the jurors about their exposure to the publicity, a trial court's refusal to undertake such questioning constitutes reversible error." *Id*.

Finally, in *State v. Lowery*, 222 W. Va. 284, 664 S.E.2d 169 (2008), the defendant was indicted on multiple counts of assault and sexual abuse of an underage victim. During the victim's testimony at trial, a spectator stood up in the courtroom and shouted "You bastard! You bastard!" The spectator was immediately escorted from the courtroom and the trial court instructed the jury to "disregard that outburst." *Id*. at 287, 664 S.E.2d at

25

The defendant moved for a mistrial, which was denied, and raised the issue again in a post-trial motion, which also was denied. This Court affirmed, holding that "a brief outburst, followed by an immediate ejection of the spectator from the courtroom, and a curative instruction, did not create a manifest necessity for a declaration of a mistrial." *Id*. at 288-89, 664 S.E.2d at 173-74.

In the instant case, Mr. Heater claims that because the trial court did not eject Ms. Stout and did not give a curative instruction to the jury, *Franklin*, *Moss*, and *Lowery* compel the conclusion that the court abused its discretion in not granting a mistrial. We disagree as there are multiple problems with Mr. Heater's analysis. First, Ms. Stout did not create a scene in the courtroom or indulge in an outburst of any sort; rather, she sat there in her motorized chair wearing a six-inch sign or button containing a picture of her son. Nothing in the record suggests that she said anything within the jury's earshot, and, in fact, the sworn testimony of Chief Deputy Miller at the post-trial motions hearing was to the opposite effect: "[n]obody said a word as the jury went through."[14] Second, although the court did not eject Ms. Stout, the trial judge did require her to relocate her motorized chair

[14]This uncontested fact distinguishes this case from our recent decision in *State v. Jenner,* 236 W. Va. 406, 780 S.E.2d 762 (2015). In *Jenner*, we remanded for hearing on the issue of possible juror misconduct "where two witnesses provided sworn, detailed testimony claiming to have seen the victim and a juror socializing with one another over the course of multiple days of trial." *Id*. at ___, 780 S.E.2d at 774. Here, in contrast, we have the mere possibility that jurors may have glimpsed a button and testimony that no members of the jury spoke to the spectator wearing the button or were spoken to by her.

26

to an area of the courtroom where she would not be close to the jury. Third, although Deputy Miller stated that jurors could possibly have seen Ms. Stout's sign/button, his description of the incident compels the conclusion that any such sighting, if indeed it happened, would have been momentary.

Fourth, and critically, Mr. Heater did not request a curative instruction and did not move for a mistrial, and is therefore not in a position to complain that the court failed to take either action. In *State v. Meadows*, 231 W. Va. 10, 743 S.E.2d 318 (2013), the petitioner claimed that, at his trial on a charge of second degree murder, the trial court erred by not declaring a mistrial or offering a curative jury instruction after defense counsel (inadvertently) elicited testimony from one of the State's witnesses concerning the results of a polygraph examination. The trial court denied the petitioner's motion for a mistrial and did not give a curative instruction to the jury, none having been requested. On review, this Court first noted that "a mistrial should be granted only where there is a manifest necessity for discharging the jury prior to the time it has rendered its verdict." *Id.* at 20, 743 S.E.2d at 328 (citing *State v. Williams*, 172 W. Va. 295, 304, 305 S.E.2d 251, 261 (1983)). Examining the record, we then concluded that, although admission of the polygraph evidence was error, such admission did not create manifest necessity for a mistrial because (a) the evidence related to a polygraph test taken by a witness, not by the petitioner; (b) the evidence was elicited not by the State but by defense counsel; and (c) defense counsel did not immediately

27

object to the witness' mention of the polygraph and did not immediately move for a mistrial, but rather waited until after the witness had been excused. *State v. Meadows,* 231 W. Va. at 21, 743 S.E.2d at 329. *See also State v. Lowery,* 222 W. Va. at 288-89, 664 S.E.2d at 173-74 (spectator's outburst in court did not create manifest necessity for a mistrial). We also held in *Meadows* that, even after the erroneous admission of polygraph evidence, there is no "hard and fast rule that a curative instruction is always required regardless if objection is raised, . . ." and, accordingly, "trial courts are not under a 'duty' . . . to provide such an instruction sua sponte." *State v. Meadows,* 231 W. Va. at 21, 743 S.E.2d at 329.

In summary, the facts in the instant show only that some of the jurors in Mr. Heater's case may have caught a momentary glimpse of a spectator's six-inch sign or button containing a one-word message ("Missing") that may or may not have meant something to them. The deputy sheriff who was with the jurors when they walked past the spectator assured the court, and later testified under oath, that no words were exchanged between the jurors and the spectator. The spectator was ordered to remove the sign/button, and thereafter she sat quietly in the courtroom in a location not near the jury box. There was no mention of Luke Stout at any time during the trial, and nothing in the record of this case would permit, let alone compel, an inference that the question of "what happened to Luke Stout" in any way tainted the jury's consideration of the charge against Mr. Heater. We therefore find that the court below had no duty to *sua sponte* issue a curative instruction, as there was

28

nothing to cure, and that the court below had no duty to *sua sponte* declare a mistrial, as there was no manifest necessity requiring such action. Mr. Heater's evidence and argument shows, at best, a "mere opportunity to influence the jury," which is clearly insufficient to warrant a new trial. *State v. Sutphin*, 195 W. Va, 551, 553, 466 S.E.2d 402, 404 (1995).

## *C. Bifurcation*

Mr. Heater's final assignment of error is that the court below erred in failing to *sua sponte* order bifurcation of the mercy phase of the trial. In support of his position, Mr. Heater points out that, during its deliberations, the jury sent a note to the judge requesting that it be re-instructed as to the difference between first and second degree murder.[15] Thereafter, because the jury returned with its verdict thirty-five minutes after receiving the clarification it sought, Mr. Heater makes the sweeping assertion that "fair and just consideration of the mercy issue was not afforded to the defendant by the jury."

In the seminal case of *State v. LaRock*, at Syllabus point 4, this Court held that "[a] trial court has discretionary authority to bifurcate a trial and sentencing in any case where a jury is required to make a finding as to mercy." 196 W. Va. 294, 470 S.E.2d 613. The issue in the mercy phase of a bifurcated proceeding "is whether or not the defendant,

---

[15]With the concurrence of all counsel, the court responded to the jury's request by sending a written copy of the entire charge into the jury room.

who already has been found guilty of murder in the first degree, should be afforded mercy, *i.e.*, afforded the opportunity to be considered for parole after serving no less than fifteen years of his or her life sentence." *State v. Trail*, 236 W. Va. 167, ___, 778 S.E.2d 616, 630 (2015). To that end, we have clarified that,

> [t]he type of evidence that is admissible in the mercy phase of a bifurcated first degree murder proceeding is much broader than the evidence admissible for purposes of determining a defendant's guilt or innocence. Admissible evidence necessarily encompasses evidence of the defendant's character, including evidence concerning the defendant's past, present and future, as well as evidence surrounding the nature of the crime committed by the defendant that warranted a jury finding the defendant guilty of first degree murder, so long as that evidence is found by the trial court to be relevant under Rule 401 of the West Virginia Rules of Evidence and not unduly prejudicial pursuant to Rule 403 of the West Virginia Rules of Evidence.

Syl. pt. 7, *State v. McLaughlin*, 226 W. Va. 229, 700 S.E.2d 289 (2010). The trial court has "wide discretion" with respect to the admission of evidence at the mercy phase of a bifurcated proceeding. *See, e.g., Lister v. Ballard*, No. 15-0028, ___ W. Va. ___, ___ n.8, ___ S.E.2d ___, ___ n.8, 2016 WL 857695, at *7 n.8 (permitting admission of testimony concerning the character of the victim).

With these principles in mind, it is readily apparent that a party's decision as to whether to move for a bifurcated proceeding will, in all cases, rest on a careful assessment of what the party has to gain or lose by bifurcation. *See, e.g., State v. Dunn*, No. 14-1037,

___ W. Va. ___, ___ S.E.2d ___, 2016 WL 1564272 (Apr. 13, 2016) (evidence that defendant's behavior was affected by his use of synthetic marijuana not admissible in unitary proceeding); *Lister v. Ballard*, No. 15-0028, ___ W. Va. ___, ___ S.E.2d ___, 2016 WL 857695 (evidence of victim's character not admissible in unitary proceeding); *State v. Berry*, 227 W. Va. 221, 707 S.E.2d 831 (2011) (evidence of defendant's social anxiety not admissible in unitary proceeding). Broadly speaking, in a bifurcated proceeding the State may have the opportunity to put on evidence that would be excluded from a unitary proceeding as too prejudicial to the defendant, whereas the defendant may have the opportunity to put on evidence that would be excluded from a unitary proceeding as irrelevant but serves to put him or her in a more sympathetic light.

When a party moves for bifurcation, it is the duty of the court to consider all grounds given in support of and in opposition to the motion, and thereafter to exercise its discretion pursuant to the factors set forth in Syllabus point 6 of *LaRock,* 196 W. Va. 294, 470 S.E.2d 613.[16] It is *not* the duty of the court to order bifurcation in the absence of a

---

[16]Pursuant to Syllabus point 6 of *State v. LaRock*,

> [a]lthough it virtually is impossible to outline all factors that should be considered by the trial court the court should consider when a motion for bifurcation is made: (a) whether limiting instructions to the jury would be effective; (b) whether a party desires to introduce evidence solely for sentencing purposes but not on the merits; (c) whether evidence would be

(continued...)

motion, as the court could be encroaching on the advocates' authority to determine strategy and tactics. *Cf. State v. Flack*, 232 W. Va. 708, 713, 753 S.E.2d 761, 766 (2013) (court has no duty to *sua sponte* give limiting instructions concerning accomplice witness testimony, as "defense counsel . . . may not want to have a *Caudill*[17] instruction because such an instruction could emphasize the damaging testimony. In such cases the trial court could be interfering with a defendant's right to develop his own trial strategy.").

With respect to the issue of bifurcation of mercy proceedings, we have previously written, but not specifically held, that "[a] trial court does not have a duty to sua sponte order bifurcation." *State v. Dunn,* No. 14-1037, ___ W. Va. ___, ___ n.14, ___ S.E.2d ___, ___ n.14, 2016 WL 1564272, *__ n.14. *See also LaRock*, 196 W. Va. at 314, 470 S.E.2d at 633 ("The motion to bifurcate may be made by either the prosecution or the defense. The burden of persuasion is placed upon the shoulders of the party moving for bifurcation."). Today we hold that, whether or not to make a motion for a bifurcated mercy

---

[16](...continued)
admissible on sentencing but would not be admissible on the merits or vice versa; (d) whether either party can demonstrate unfair prejudice or disadvantage by bifurcation; (e) whether a unitary trial would cause the parties to forego introducing relevant evidence for sentencing purposes; and (f) whether bifurcation unreasonably would lengthen the trial.

196 W. Va. 294, 470 S.E.2d 613.

[17]*State v. Caudill*, 170 W. Va. 74, 289 S.E.2d 748 (1982).

proceeding pursuant to *State v. La*Rock, 196 W. Va. 294, 470 S.E.2d 613, is a matter of strategy and tactics and is thus a decision to be made by the parties and their advocates. A trial court does not have a duty to *sua sponte* order bifurcation.

Finally, we note that, once again, Mr. Heater's brief is long on dramatic prose and short on facts. During the trial there was no evidence presented by either the State or the defense as to aggravating or mitigating factors, *i.e.*, there was no Rule 404(b) evidence, no character evidence, no evidence relevant to anything other than Mr. Heater's guilt or innocence. Thus, there is no basis at all for Mr. Heater's assumption that the jury did not take enough time to consider the mercy issue; there was not much to consider other than whether a contract killer should have a chance at parole. Additionally, Mr. Heater has not given this Court even a hint as to what evidence he might have produced, or how he might otherwise have benefitted from, a bifurcated mercy proceeding. Apart from the facts of this case, which are horrific and more than sufficient to support a no-mercy verdict, the only evidence in this record relevant to mercy is information presented to the court at sentencing, all of which led the court to conclude that:

> [Y]ou are a very violent and dangerous person. And, you know, to end somebody's life, to take them out and execute them for, the allegation was $5,000.00, is just not acceptable and the Court believes that somebody that does that needs to be separated from society and I believe that, once again, the jury reached the correct verdict in this case by recommending that you not receive mercy in this case.

33

## IV.

## CONCLUSION

Based upon the foregoing analysis, we affirm the judgment of the Circuit Court of Upshur County convicting Mr. Heater of murder in the first degree, without a recommendation of mercy; conspiracy to commit murder; concealment of a deceased human body; and conspiracy to conceal a deceased human body. We likewise affirm the circuit court's order sentencing Mr. Heater to life imprisonment without mercy and three consecutive sentences of one-to-five years in the penitentiary.

Affirmed.